UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ANTARES MANAGEMENT LLC,                          12-CV-6075(TPG)
SARANSH SHARMA,

                          Plaintiffs,                     **OPINION**


-against-


GALT GLOBAL CAPITAL, INC.,
GLOBAL INNOVATION FUND, LTD;
GLOBAL INNOVATION SPV 1, LTD.,
and GARY BARTHOLOMEW,


                          Defendants.
-------------------------------------------------------------x

      Plaintiffs, Antares Management and its founder, Sarish Sharma, commenced this action in New York State Supreme Court, against Galt Global Capital, Inc., Global Innovation Fund, Ltd. ("GIF"), two foreign entities, and Gary Bartholomew —a Canadian citizen and principal of Galt and an agent of GIF—seeking compensation under an alleged oral finder's fee arrangement. After defendants removed the action to this court and moved to dismiss the complaint, plaintiffs filed an amended complaint, adding another institutional defendant, Global Innovation, SPV I, Ltd. ("SPV"), an entity for which Bartholomew also allegedly acted as an agent.

      The action arises from defendants' alleged refusal to pay plaintiffs an agreed upon finder's fee and from defendants' alleged solicitation of plaintiffs' business contacts in

violation of an express, written non-circumvention agreement. Plaintiffs seek compensation for the work they allegedly performed in connection with their joint venture with defendants and the business opportunities plaintiffs lost as a result of defendants' alleged tortious actions.

Count One of the complaint alleges breach of contract with respect to the finder's fee arrangement. Count Two alleges breach of contract with respect to the non-circumvention agreement. Count Three alleges breach of fiduciary duty. Count Four alleges quantum meruit. Count Five alleges unjust enrichment. Count Six alleges estoppel. Count Seven alleges defamation. Count Eight alleges tortious interference with prospective economic advantage. And finally, Count Nine alleges civil conspiracy.

In two respective motions, all of the defendants, Gary Bartholomew, Galt Global Capital, Inc., Global Innovation Fund, Ltd., Global Innovation SPV I, Ltd., have moved to dismiss the complaint with prejudice, arguing that the court lacks personal jurisdiction over GIF and SPV; plaintiffs have failed to serve Bartholomew or SPV; plaintiffs have failed to state a claim for relief on all Counts; the claims plaintiffs have attempted to plead would be barred by the statute of frauds; and finally, even if plaintiffs have properly pleaded their claims, the finder's fee contract they seek to enforce is illegal.

The motions to dismiss are denied with respect to all Counts.

## THE COMPLAINT

The following facts are drawn from the complaint and assumed to be true for purposes of this motion.

Plaintiff, Antares Management, provides market research, finder, and consulting services in the financial and social media sectors. Am. Compl. ¶¶ 21, 22, 27-34. In September of 2010, defendant Bartholomew  approached plaintiff, Saransh Sharma, and told him that he and his company, Galt Global Capital, Inc., were raising money for certain social media funds, including GIF and, later, SPV. Id. ¶ 37.

GIF and SPV are entities that invest in shares of social media companies, including, among others, Facebook, Inc. Galt served in the role of investment advisor to both funds, and Galt's office in New York was the headquarters for recruiting agents to raise money for both entities. Id. at ¶¶ 4, 8.[1] In 2010, Facebook was a private social networking company whose shares could be purchased only from insiders. Because Facebook was expected to make an initial public offering that could result in a rapid increase in the valuation of its shares, they were in high demand. Defendants recognized that plaintiffs offered valuable

---

[1] The court takes *sua sponte* judicial notice of Facebook Inc.'s international popularity and widespread influence. As the New York Times describes it, Facebook, by some measurements, is the most popular social network. With 175 million active users worldwide, it is one of the fastest-growing and best-known sites on the Internet today. The company, founded in 2004 by a Harvard sophomore, and (now somewhat legendary entrepreneur) Mark Zuckerberg, began life catering first to students of Harvard University and then to all high school and college students. It has since evolved into a broadly popular online destination used by both teenagers and adults of all ages. See Facebook, NEW YORK TIMES, available at http://topics.nytimes.com/top/news/business /companies/facebook_inc/; Kaggen v. I.R.S., 71 F.3d 1018, 1019 (2d Cir. 1995)(noting appropriate circumstances for *sua sponte* judicial notice).

links to both potential investors and sellers of shares of social media companies, including Facebook. Id. at ¶¶ 35-45.

Plaintiffs and defendants thus allegedly agreed to work together as partners in a joint venture and share expenses and losses. In the course of this joint venture, Sharma became a shareholder of Galt and subsequently agreed to exchange those shares for shares in a related company called Equinox Galt Capital Partners, LLC. Id. ¶¶ 46-53.

Over the next several months, plaintiffs allegedly attempted to introduce multiple parties to defendants, including one Juthoor Corporation. The parties signed a term sheet and release agreement on March 23, 2011, which purported to release only those claims that arose "prior to the date hereof." On April 14, 2011, Bartholomew e-mailed Sharma and expressed his view that attracting investors to GIF remained the most viable option for the parties. Bartholomew also indicated that, in essence, the parties would be in a good position to pursue their venture if they could just find an investor interested in contributing at least $50 million toward the investment effort. (Id. ¶¶ 54-58, 60-62). On April 23, 2011, Bartholomew sent yet another e-mail to Sharma in which he reiterated the agreement to split equally any fees generated from investors introduced by plaintiffs. Id. ¶¶ 63-64.

Months later, on September 24, 2011, the parties signed a mutual non-disclosure and non-circumvention agreement, which provided, except as expressly agreed, that the parties would refrain from using each other's confidential information, including each other's "business relationships . . . business contacts, opportunities and prospects." It also

4

provided that neither party could "make any contact or deal with any legal entity or individual identified or introduced to him by the other Party regarding a proposed or potential transaction, without the express, written permission of the other Party, during the Term hereof and for a period of three (3) years from the expiration or termination hereof." Id. ¶¶ 84-88. The Non-Circumvention Agreement was executed for the purpose of exploring "certain business and investment opportunities . . . primarily focused on the sourcing and acquisition of private Facebook Shares." Am. Compl. Ex. 2 at 1. It also included a choice of law clause that applied New York law to disputes among the parties and a forum selection clause that selected New York as the venue for such disputes. The clause reads in pertinent part:

> This agreement shall be governed by the laws of the State of New York. the parties expressly hereby submit to the non-exclusive jurisdiction of the federal and state courts having venue in New York. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to laying of the venue of any proceeding brought in any such court and any claim that any such proceeding has been brought in an inconvenient forum.

Am. Compl. Ex. 2 ¶ 9.

Bartholomew executed the non-circumvention agreement on behalf of Galt and "its affiliates, directors, officers, employees, representatives, agents and advisors." After consummating the agreement, plaintiffs expended their time and resources to find potential investors for GIF. In January 2012, plaintiffs met with Juthoor Corporation and offered, once again, to introduce it to defendants. On January 10, 2012, Juthoor executed a letter of interest ("LOI"), which was addressed to Sharma and Antares. In it, Juthoor stated its

interest in investing in "Global Innovation Fund, Ltd." managed by "Galt Global Capital, Inc." with sufficient capital to purchase ten million shares of Facebook at a price of $31 per share or less. It also expressed its willingness to pay a front-end fee of ten percent, or $31 million, in addition to a performance fee of 20 percent of any profits. Juthoor concluded by writing, "We look forward to consummating this investment as soon as possible." Am. Compl. ¶¶ 65-73.

On January 11, 2012, plaintiffs attempted to present the LOI to defendants. The LOI allegedly met all the terms sought: Juthoor was a ready, willing and able investor; the fees generated by Juthoor were guaranteed to be a minimum of $31 million; and, plaintiffs and defendants would each receive half of this fee, or $15.5 million. Id. ¶¶ 74-79. Notwithstanding the alleged agreement between the both parties, defendants refused to consider Juthoor as an investor. Plaintiffs allege that the rejection was in bad faith because defendants did not wish to share any fees associated with the underlying agreement. Id. ¶¶ 80-82.

On February 7th, 2012, plaintiffs were approached by yet another investor, European Financial Products Group ("EFG"), a private bank headquartered in Switzerland. EFG indicated its interest in acquiring up to 20 million shares of Facebook and agreed to pay plaintiffs $1.50 per share for any introductions that led to EFG's purchase of Facebook shares. Plaintiffs allege that they stood to earn up to $30 million dollars for any successful introductions and therefore organized a phone call between EFG and Bartholomew concerning EFG's potential investment in the SPV. Id. ¶¶ 92-97.

Notwithstanding the non-circumvention agreement, plaintiffs allege that defendants allegedly thereafter communicated directly with EFG concerning EFG's potential investment in the SPV in violation of the agreement; made false and defamatory statements about plaintiffs' competence during these communications; and urged EFG to terminate plaintiffs as finders. Id. ¶¶ 98-101. Plaintiffs, consequently, issued a cease and desist letter, which directed the defendants to terminate their communications with EFG and notified them that they were violating the non-circumvention agreement. Defendants did not respond and allegedly continued to solicit EFG as an investor in the SPV. As a consequence of defendants' actions, plaintiffs aver that EFG canceled its agreement with plaintiffs. Id. ¶¶ 102-05.

On June 22, 2012, plaintiffs filed this action in New York State Supreme Court and served both Galt and GIF in the Cayman Islands on July 16, 2012. Plaintiffs attempted to serve Bartholomew at his residence in Canada on numerous occasions, yet they were told each time that Bartholomew was unavailable.

On August 13, 2012, Defendants removed the lawsuit to this court and, on August 16, 2012, moved to dismiss the original complaint. On August 31, 2012, plaintiffs filed the amended complaint, which added the SPV as a defendant.

On September 11, 2012, plaintiffs' counsel directed process servers to serve the amended complaint on the SPV and, for a fourth attempt, on Bartholomew. On October 11, 2012, the SPV was served in the Cayman Islands. In their fourth attempt, plaintiffs also

successfully served Bartholomew on October 2, 2012 by going through the Canadian central authority.

## DISCUSSION

### CHOICE OF LAW

The parties have proceeded on the assumption that New York law controls plaintiffs' claims. Because they have done this, and because the non-circumvention agreement out of which much of the instant dispute arises contains a New York choice of law provision, the court will apply New York with respect to the underlying claims. In re Lois/USA, Inc., 264 B.R. 69, 93 (Bankr. S.D.N.Y. 2001).

### PERSONAL JURISDICTION

In support of the motion to dismiss, defendants over GIF and SPV first argue that this court lacks personal jurisdiction. To survive a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), plaintiff bears the burden of showing that the court has personal jurisdiction over defendant.  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).  In resolving such a motion at the pleading stage, the court must assume the plaintiff's factual allegations to be true.  Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

In diversity cases, personal jurisdiction is generally determined by the law of the state in which the district court sits; in this case, the court applies New York law. DiStefano

v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001). Therefore, to determine whether personal jurisdiction may be properly exercised, the court must first determine whether the plaintiff has shown that the defendant is amenable to service of process under New York law; second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process under the United States Constitution. Savin v. Ranier, 898 F.2d 304, 306 (2d Cir.1990).

However, when the parties have consented to jurisdiction by agreeing to a valid and enforceable forum selection clause – as the parties have here – the analysis is simplified to a great extent. Am. Compl. Ex. 2 ¶ 9. Agreement to the clause establishes contacts sufficient to satisfy the jurisdictional requirements of both New York law and the Due Process Clause.  See U.S. Bank Nat. Ass'n v. Ables & Hall Builders, 582 F. Supp. 2d 605, 615 (S.D.N.Y. 2008) (collecting cases).

There is, moreover, a strong presumption in favor of upholding the enforceability of forum selection clauses. See Bluefire Wireless, Inc. v. Cloud9 Mobile Commc'ns, Ltd., No. 09 Civ. 7268, 2009 WL 4907060, at *3 (S.D.N.Y. Dec. 21, 2009). Forum selection clauses play a vital role in ensuring predictability in contract formation. In re Refco Inc., Securities Litigation, No. 08 Civ. 3086, 2009 WL 5548666, at *5 (S.D.N.Y. Nov. 16, 2009).  To enforce a forum selection clause, a party must show that: (1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and, (3) the claims and parties involved in the suit are subject to the forum selection clause. Tropp v. Corporation of Lloyd's, 385 Fed. Appx. 36, 37 (2d

9

Cir.2010). Even if all three criteria are met, the opposing party may "make a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." Phillips v. Audio Active Ltd., 494 F.3d 378, 383–84 (2d Cir.2007).

Additionally, a valid forum selection clause may bind non-parties to a contract if the relationship between the non-party and the signatory is sufficiently close such that enforcement of the forum selection clause is foreseeable. See In re Optimal U.S. Litig., 813 F. Supp. 2d 351, 369-70 (S.D.N.Y. 2011). Thus, non-signatory status does not necessarily prevent the third party from being bound by the forum selection clause. See LaRoss Partners, LLC v. Contact 911 Inc., 11-CV-1980 ADS ARL, 2012 WL 2856099, at *4 (E.D.N.Y. July 10, 2012). Indeed, courts within this Circuit have held that "[i]t is well established that a 'range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.' " LaRoss Partners, LLC at *4 (quoting Weingrad v. Telepathy, Inc., 2005 WL 2990645, at *5 (S.D.N.Y. Nov. 7, 2005)).

The first question the court must address is whether the clause was reasonably communicated to the parties. Here, defendant Bartholomew allegedly signed the non-circumvention agreement on behalf of Galt "its affiliates, directors, officers, employees, representatives, agents and advisors." Because GIF and the SPV were the alleged conduits for Galt's investment opportunities, the non-circumvention agreement therefore likely contemplated some role and some benefit for both GIF and the SPV with respect the parties' business relationship. The non-circumvention agreement was also allegedly

10

executed for the purpose of exploring "certain business and investment opportunities . . . primarily focused on the sourcing and acquisition of private Facebook Shares." <u>Am</u>. <u>Compl</u>. Ex. 2 at 1. In sum, the court finds that agreement was clearly communicated to the defendants.

The second question is whether the clause is mandatory and not merely permissive. The agreement clearly contains a forum selection clause, designating the state and federal courts of New York State as the exclusive fora for any resolution of disputes, which might arise between the parties. <u>Am</u>. <u>Compl</u>. Ex. 2 at 1. This term was plainly mandatory, not permissive. <u>M/S Bremen v. Zapata Off-Shore Co</u>., 407 U.S. 1, 10 (1972). In short, there can be no question that the forum selection clause was binding.

The final question that the court must address is whether the claims and parties in this suit are subject to the forum selection clause. Here, the conduct that violated the agreement, i.e. defendants' alleged contacting of both Juthoor and EFG without the permission of Antares or Sharma, would have violated the term of the agreement requiring the parties to refrain from using each other's confidential information, including each other's "business relationships . . . business contacts, opportunities and prospects" and that barring any party from making "any contact or deal with any legal entity or individual identified or introduced to him by the other Party regarding a proposed or potential transaction, without the express, written permission of the other Party." <u>Id</u>. ¶¶ 84-88. Thus, the court finds that the claims and the parties involved in this action relate the same underlying transactions and facts and are therefore subject to the forum selection clause.

11

In consequence, the court finds that plaintiffs have alleged adequate facts to support the enforcement of the forum selection clause with respect to all of the parties and claims and that the court has personal jurisdiction as a result of the forum selection clause.

## BARTHOLOMEW AND SPV WERE PROPERLY SERVED

Defendants also seek to dismiss plaintiffs' claims against Bartholomew and the SPV on the grounds that they have not been served.

An individual may be served in a foreign country "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention. . . ." Fed. R. Civ. P. 4(f). Rule 4(m) expressly exempts service in foreign countries from the 120-day limit, which applies to defendants located in the United States, as long as the plaintiff attempts to serve the defendant in the foreign country.

Here, all of the defendants have now been served. Plaintiffs served Bartholomew with process in Canada pursuant to the Hague Convention on October 2, 2012. Sher Decl. Ex. F. Also, on October 11, 2012, plaintiffs served SPV in the Cayman Islands pursuant to the Hague Convention. Id. Ex. E. Therefore, the court denies defendants' respective motions to dismiss plaintiffs' claims against Bartholomew and the SPV.

## THE 12(B)(6) MOTIONS

Defendants have also moved under Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state a claim for relief on all of Counts of the complaint. To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is

plausible on its face.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, (2009).  In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions. Iqbal, 556 U.S. at 678-79.  A court must also draw all reasonable inferences in the plaintiff's favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit.  ATSI Commc'ns, Inc. v. Shaar Fund. Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

The court's role in deciding a motion to dismiss is merely to assess the legal feasibility of the complaint, not to evaluate the weight of the evidence which might be offered in support thereof.  Saunders v. Coughlin, 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar. 15, 1994). The issue is not whether plaintiffs will ultimately prevail but whether the claimants are entitled to offer evidence to support the claims.  Id. The court now turns its attention to each of plaintiffs' claims, which have been addressed by both defendants' motions, collectively.

BREACH OF CONTRACT – FINDER'S FEE ARRANGEMENT

Defendants first move to dismiss plaintiff's breach of contract claim. Count One alleges breach of contract and breach of the implied covenant of good faith and fair dealing. To state a claim for breach of contract, plaintiff must allege sufficient facts concerning (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the

defendant, and (4) damages. <u>Fischer & Mandell LLP v. Citibank, N.A.</u>, 632 F.3d 793, 799 (2d Cir. 2011).

Under New York law, a covenant of good faith and fair dealing is also implied in all contracts. <u>See</u> <u>Cross & Cross Props., Ltd. v. Everett Allied Co.</u>, 886 F.2d 497, 502 (2d Cir.1989). This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. <u>Fishoff v. Coty Inc.</u>, 634 F.3d 647, 653 (2d Cir. 2011).

New York courts distinguish between finder's and broker agreements. Finders locate potential buyers or sellers, stimulate interest and bring parties together, while brokers bring the parties to an agreement on particular terms. <u>Train v. Ardshiel Associates, Inc.</u>, 635 F Supp. 274, 279 (S.D.N.Y. 1986). Finders must demonstrate that the final deal which was carried through flowed directly from his introduction of the matter to be entitled to collect his fee. <u>Id</u>. A finder or broker earns his commission when he produces a buyer ready, willing, and able to purchase at terms set by the seller. <u>Stiefvater Real Estate, Inc. v. Hinsdale</u>, 812 F.2d 805, 807 (2d Cir. 1985); <u>Lane The Real Estate Dep't Store, Inc. v. Lawlet Corp.</u>, 28 N.Y.2d 36 (1971).

Here, plaintiffs allege that they entered into a valid agreement with defendants to identify potential investors and to introduce them to defendants. This sort of stimulation of investment interest is precisely what is contemplated under New York law governing finder's fee arrangements. That agreement, moreover, allegedly was based upon an understanding that the parties would share equally any fees generated from investments in

14

the defendants' funds, including GIF and SPV, which would result from plaintiffs' introduction of investors to defendants.

In support of Count One, plaintiffs describe in their complaint e-mails from April 2011, which allegedly provided the material terms of their agreement. In the first e-mail, defendant Bartholomew asks plaintiffs to help the defendants locate an investor to contribute $50 million if "you still want to work on this with Trevor and I." Am. Compl. ¶¶ 60-62. Trevor Michael is allegedly managing partner of Galt and an advisor and agent for GIF and the SPV. Sharma Decl. ¶ 9.

In yet another e-mail, defendants stated that they were prepared to share a "fee split of 50%" each if plaintiffs had "any capital source that we can push to the fund . . . and the pitch is we have access to FB stock at $23-25/share. . . ." Am. Compl. ¶¶ 63-64. On April 14, 2011, Bartholomew e-mailed Sharma and expressed his view that attracting investors to GIF remained the most viable option for the parties. Bartholomew also indicated that, in essence, the parties would be in a good position to pursue their venture if they could just find an investor interested in contributing at least $50 million toward the investment effort. Id. ¶¶ 54-58, 60-62. Plaintiffs further allege that these exchanges resulted in an agreement obligating the defendants to accept any investor who offered to invest $50 million or more in shares of Facebook at a price of $23 per share or higher and that defendants breached this obligation and the implied covenant of good faith and fair dealing by refusing to consider Juthoor and driving away EFG. Am. Compl. ¶¶ 113, 116-27. They also allege that defendants committed these breaches in bad faith in order to avoid sharing fees and that

plaintiffs suffered $45.5 million in damages as a result of the breach. Id. ¶¶ 106, 126, 118, 193, 196.

In response, defendants argue that plaintiffs' claims are barred by a term sheet and release agreement, which was signed by the parties. However, plaintiffs point out that the term sheet is dated March 23, 2011 and purports to release only those claims that arose "prior to the date hereof." Bartholomew Decl. Ex. A ¶ 8. Plaintiffs argue that they based their their first cause of action on the agreement that was entered into one month later in April of 2011 when the parties exchanged the emails discussed above, and that the alleged breaches took place in January and February 2012. Am. Compl. ¶¶ 66-73, 92-97.

The court finds that the terms of the agreement upon which plaintiffs have based their breach of contract claim arose from the email correspondence between the parties in April of 2011. Plaintiffs' factual allegations are certainly sufficient to support a *prima facie* breach of contract claim and a claim for breach of the implied covenant of good faith and fair dealing with respect to the alleged finder's fee arrangement. Defendants' motions to dismiss Count One are therefore denied.

BREACH OF CONTRACT – THE NON-CIRCUMVENTION AGREEMENT

Defendants have also moved to dismiss Count Two of the complaint, which alleges that all of the defendants breached the non-circumvention agreement – that expressly applied to Galt and all of its "affiliates" – when they directly communicated with EFG after plaintiffs introduced EFG to defendants. Id. ¶¶ 90, 98-11, 128-140. In response,

16

defendants simply argue that plaintiffs' allegations of damages are inadequate. They do not contend that plaintiffs have failed to plead any of the other elements required to establish a *prima facie* breach of contract claim as to Count Two.

Defendants' contention with respect to damages is belied by the face of the complaint. Plaintiffs specifically allege that defendants' unlawful communications with EFG, which violated the non-circumvention agreement, caused EFG to abandon a deal that would have generated $30 million in fees. Id. ¶¶ 98-101, 105, 137-140.

Therefore, defendants' motion to dismiss Count Two is denied.

THE ILLEGALITY OF THE CONTRACT

Defendants also attack plaintiffs' finder's fee related contract claims on the ground that plaintiffs' broker activity was illegal because plaintiffs were not registered brokers.

Section 15(a)(1) of the Exchange Act makes it unlawful for any broker or dealer to engage in securities transactions unless such broker or dealer is registered in accordance with federal law.[2] Defendants contend that plaintiffs were not registered brokers or dealers and that the conduct underlying the contract, i.e. arranging the potential investments, renders the underlying agreement illegal under Section 29(b) of the 1934 Exchange Act, 15

---

[2] In particular, section 15(a)(1) of the Exchange Act makes it unlawful for "any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

U.S.C. § 78cc(b). Section 29(b) provides in relevant part that "every contract made in violation of any provision of [the 1934 Act] or of any rule or regulation thereunder ... shall be void...." <u>Cohen v. Citibank, N.A.</u>, 954 F. Supp. 621, 626 (S.D.N.Y. 1996).

To find a contract unenforceable for illegality at the pleading stage, the question is whether the contract "on its face" requires the unregistered finder to perform broker services. <u>Matter of Sprinzen</u>, 46 NY2d 623, 631 (1979); <u>see</u> <u>Foundation Ventures, LLC</u> v. <u>F2G, Ltd.</u>, 2010 WL 3187294, *1, *7, (S.D.N.Y. Aug. 11, 2010). As discussed above, a finder locates potential buyers or sellers, stimulates their interest, and brings parties together, while a broker brings the parties to an agreement on particular terms. <u>Jones v. Whelan</u> at *7 (S.D.N.Y. Mar. 29, 2002).

Here, plaintiffs do not allege that they were involved in any negotiation with respect to the specific terms of the agreement or that they helped prepare any documents to consummate transactions, which would indicate that they were acting as brokers. In fact, it appears, at least at this point, that plaintiffs' main role involved stimulating general investment interest.

Although discovery may give rise to facts suggesting that the plaintiffs were acting as unregistered brokers in violation of section 29(b) of the Exchange Act, that issue is cannot be addressed at this stage in the litigation. Defendants' motions to dismiss the breach of contract claim because of its alleged illegality are therefore denied.

STATUTE OF FRAUDS

Defendants next seek to dismiss plaintiffs' claims which relate to a finder's fee arrangement – breach of contract, unjust enrichment, quantum meruit and estoppel – on the grounds that plaintiffs' claims are barred by N.Y. Gen. Oblig. L. § 5-701(a)(10), New York's law on the statute of frauds.

The provision of the statute of frauds upon which defendants rely applies to contracts "to pay compensation for services rendered in negotiating . . . a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest." Id.

Defendants contend that plaintiffs have relied upon an alleged oral agreement between the parties, which fails to satisfy the statute. The New York Court of Appeals has held that section 5-701 applies to finder's fee agreements. Freedman v. Chemical Construction Corp., 43 N.Y.2d 260, 266 (1977); Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 378 (1969). No different conclusion can be reached here.

Notwithstanding its application, plaintiffs' claims may survive dismissal if the underlying agreement satisfies the statute. In a contract action, a memorandum sufficient to meet the requirements of the statute of frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter. Morris Cohon & Co. v Russell, 23 NY2d 569,

19

575 (1969); see Intercontinental Planning v Daystrom, Inc., 24 NY2d 372, 378-379 (1969). If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract. Cobble Hill Nursing Home v Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989), cert denied, 498 US 816 (1990).

A sufficient writing under the statute of frauds may be established by a combination of signed and unsigned documents, letters or other writings provided "at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged (or his authorized agent), while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed." Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 379 (1969); Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 57 (1953). Additionally, certain e-mail correspondence may adequately meet the requirements of the statute of frauds under New York law. N.Y. Gen. Oblig. L. § 5-701(b)(4); Newmark & Co. Real Estate Inc. v 2615 E. 17 St. Realty LLC, 80 AD3d 476, 477 (2011).

In the first e-mail, sent on April 11, 2011, Bartholomew, acting on behalf of all defendants, allegedly invited plaintiffs to help find an investor for "the fund," i.e. GIF, and noted that an investor willing to contribute $50 million would be sufficient. In the second e-mail, Bartholomew again allegedly stated that he wanted plaintiffs to find investors for a "few $50M tickets to GIF and clarified that he was prepared to split the fund fees at 50%." Sharma responded by noting that JPMorgan was looking for stock on these terms and promising to keep defendants "posted."

20

In addition to these emails, the non-circumvention agreement signed by both parties appears to confirm the parties' intent to seek the investment opportunities, which focused upon the sourcing and acquisition of private Facebook shares.

In sum, the court finds that these email communications, as well as the signed non-circumvention agreement's provisions, clearly establish adequate terms of a contract for purposes of satisfying the statute of frauds with respect to the finder's fee arrangement.

BREACH OF FIDUCIARY DUTY

In Count Three, plaintiffs allege breach of fiduciary duty with respect to an alleged partnership arrangement. To establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages directly caused by the defendant's misconduct. Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't. 2007).

A fiduciary relationship exists under New York law "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of relation." Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir.1991). Rather than determining the existence of a fiduciary relationship "by recourse to rigid formulas, ... courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F.Supp. 1220, 1231 (S.D.N.Y.1991), rev'd on other grounds, 967 F.2d 742 (2d Cir.1992).

21

Under New York law, five elements must be present to form a partnership: (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses. Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 472 F. Supp. 2d 544, 552 (S.D.N.Y. 2007).

A partner in a joint venture, as a fiduciary, is invariably held to higher standards than those of the marketplace. "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, C.J.); see also NCAS Realty Mgmt. Corp. v. Nat'l Corp. for Hous. Partnerships, 143 F.3d 38, 39-40 (2d Cir. 1998).

Defendants argue that the language contained in the non-circumvention agreement is forward-looking in nature and simply suggests that the parties were "interested" in considering future business and investment opportunities and that, as of that date, there was no business relationship between the parties. In sum, they argue that no partnership existed.

However, plaintiffs allege that the parties formed an oral partnership, which was reflected in a series of writings wherein plaintiffs and defendants agreed to endeavor to facilitate deals through their combined connections and would equally share any profits

and losses that were generated from their joint endeavors. Am. Comp. at ¶¶ 142, 143. They also allege that the parties agreed to jointly manage the venture and that, as a result of the arrangement, defendants owed plaintiffs fiduciary duties, including duties of care, good faith and loyalty.  Id. at ¶¶146, 145. Defendants allegedly breached the fiduciary duties owed under the partnership by exploiting plaintiffs' contacts for defendants' own benefit and proceeded to raise funds from investors identified through plaintiffs' contacts. This allegedly caused plaintiffs to sustain approximately $45.5 million in damages. Id. at ¶¶ 147, 149.

The court finds that these allegations are sufficient to meet the elements of establishing the existence of an alleged partnership. Further, the court finds that plaintiffs have established a *prima facie* breach of fiduciary duty claim; that is, plaintiffs' have alleged the existence of a fiduciary relationship through the partnership, misconduct by the defendants, and damages.[3] Therefore the court denies defendants' motions to dismiss plaintiffs' breach of fiduciary duty claim.

QUANTUM MERUIT & UNJUST ENRICHMENT

Counts Four and Five allege quantum meruit and unjust enrichment claims, respectively. Defendants argue that these claims are also barred because they are based on the same alleged promises which support plaintiffs' breach of contract claim. This

---

[3] Defendants' contention is also controverted by the term sheet and release agreement, which acknowledges the existence of a "previous arrangement, agreement or understanding" as of March 23, 2011, which, as plaintiffs note in their opposition, was months before the parties executed the non-circumvention agreement. Bartholomew Decl. Ex. A ¶5.

23

argument, however, is misplaced at the pleading stage. <u>See</u>, <u>e.g.</u>, <u>Marcella v. ARP Films, Inc.</u>, 778 F.2d 112, 117 (2d Cir.1985) (noting that a "plaintiff may quite properly submit" the alternative theories of breach of contract and quantum meruit); <u>see</u> <u>Diversified Carting, Inc. v. City of New York</u>, 04 Civ. 9507(HB), 2005 WL 1950135 at *10 (S.D.N.Y. Aug. 15, 2005) (denying a motion to dismiss and explaining that a plaintiff is permitted to plead breach of contract and quantum meruit in the alternative).

Unjust enrichment "is a required element for an implied-in-law, or quasi contract, and quantum meruit ... is one measure of liability for the breach of such a contract." <u>Seiden Assoc., Inc. v. ANC Holdings, Inc.</u>, 768 F. Supp. 89, 96 (S.D.N.Y. 1991). Thus, the two claims are properly analyzed as a single claim for restitution sounding in quasi-contract. <u>See</u> <u>Newman & Schwartz v. Asplundh Tree Expert Co.</u>, 102 F.3d 660, 663 (2d Cir. N.Y. 1996). In the present case, the factual allegations concerning breach of contract also suffice to state a claim for quasi-contract. [4]

It is true that plaintiffs cannot ultimately recover on both his quasi-contract claim and his breach of contract claim. <u>See</u> <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 521 N.Y.S.2d 653, 656 (N.Y. 1987). But at this stage of the litigation, when "there is a bona fide

---

[4] Although under New York law, claims for quantum meruit and unjust enrichment are to be analyzed as one, their elements differ, at least nominally. <u>Compare</u> <u>Revson v. Cinque & Cinque, P.C.</u>, 221 F.3d 59, 69 (2d Cir. 2000) ("In order to recover in quantum meruit, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.") <u>with</u> <u>Giordano v. Thomson</u>, 564 F.3d 163, 170 (2d Cir. 2009) ("Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant."). For present purposes, these differences are not germane. As the case proceeds, however, it may become clear that one of the types, so to speak, of quasi-contract better fits the facts than the other.

dispute as to the existence of a contract or where the contract does not cover the dispute in issue," a plaintiff may proceed upon a theory of quasi-contract and need not elect his or her remedies. Joseph Sternberg, Inc. v. Walber 36th St. Assocs., 594 N.Y.S.2d 144, 146 (1st Dep't 1993).

In the present case, there is obviously a bona fide dispute as to the existence of the alleged contract between the parties. Indeed, defendants have argued that no such contract exists. Although the court has rejected that argument for purposes of the motion to dismiss, defendants can, of course, dispute the existence of the contract going forward as the facts permit. In light of this dispute, the court will not dismiss plaintiffs' quasi-contract claims.

ESTOPPEL

In Count Six, plaintiffs additionally allege that defendants should be estopped from denying the existence of an agreement between the parties. Although pled simply as estoppel, the form of plaintiffs' allegation falls more accurately within the analytical framework of a promissory estoppel claim. Therefore, the court will proceed with such an analysis.

In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and, an injury sustained by the party asserting the estoppel by reason of the reliance. Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir.1989); see also

Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787, 793 (2d Cir.1986).

Plaintiffs allege that defendants promised to pay them 50 percent of all fees generated from investors introduced by plaintiffs. They also aver that plaintiffs reasonably and foreseeably relied upon defendants' promises to their own detriment by expending time and effort to identify potential investors in GIF and SPV in order to arrange such introductions. Additionally, they contend that defendants were aware of this reliance. And finally, plaintiffs allege that defendants should be estopped from disavowing their obligations to pay plaintiffs fees in connection with plaintiffs' performance of finder services. Am. Comp. ¶¶ 167-170.

These allegations squarely address each of the elements of a promissory estoppel claim under New York law and – when taken together with the factual allegations supporting their breach of contract claim – are more than adequate to establish a *prima facie* estoppel claim. Defendants' motions to dismiss with regard to Count Six are therefore denied.

DEFAMATION

Count Seven alleges defamation. Under New York law, to establish a claim for defamation a party must allege: (1) a false statement of fact, (2) about plaintiff (3) published to a third party without authorization or privilege, (4) through fault amounting to at least negligence, and (5) causing defamation per se or a special harm. Gristede's Foods, Inc. v.

Poospatuck (Unkechauge) Nation et al., No. 06–CV–1260, 2009 WL 4547792, at *8 (E.D.N.Y. Dec. 1, 2009).

A statement that "tend[s] to injure another in his or her trade, business or profession" is defamatory per se. Stern v. Cosby, 645 F.Supp.2d 258, 273 (S.D.N.Y.2009) (citing Liberman v. Gelstein, 80 N.Y.2d 429, 435 (1992)). In such a situation, the plaintiff need not prove special damages, i.e., economic or financial loss. Sharratt v. Hickey, 20 A.D.3d 734, 735, 799 N.Y.S.2d 299 (3d Dep't 2005); Liberman v. Gelstein, 80 N.Y.2d 429, 435 (1992).

Here, plaintiffs assert their defamation claim as such – defamation. However, the claim is more properly construed by the court as a defamation per se claim. Plaintiffs have alleged that certain communications occurred between defendants and EFG in February and March 2012 – prior to EFG's termination of its finder arrangement with plaintiffs – and that the communications included false statements about defendants' ability to deliver tradable shares of Facebook and plaintiffs' competence to perform finder services. Am. Compl. ¶¶ 97-105, 173-76.

These allegations of per se defamation are adequate to survive dismissal for failure to state a claim. While defendants argue that plaintiffs have failed to plead special damages,

this argument is inapposite – special damages need not be pled when a plaintiff alleges defamation *per se* as plaintiffs have done here.[5]

Therefore, defendants' motions to dismiss plaintiffs' defamation claim are denied.

TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Count Eight alleges tortious interference with prospective economic advantage. Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that: (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper [wrongful] means; and (4) the defendant's interference caused injury to the relationship. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir.2003).

Here, defendants only contend that plaintiffs have failed to plead wrongful means. For defendants' interference to constitute the kind of "wrongful means" that will support plaintiffs' claim for tortious interference, one of the following must be true: (1) that conduct must amount to an independent crime or tort; (2) that conduct must have been taken solely out of malice; or (3) that conduct must amount to "extreme and unfair" economic pressure. Friedman v. Coldwater Creek, Inc., 551 F. Supp. 2d 164, 170 (S.D.N.Y. 2008) (Chief Judge Preska).

---

[5] Notwithstanding this flaw in defendant's contention, plaintiffs, in fact, allege a $30 million loss, which they claim resulted from the cancellation of the finder arrangement. Am. Compl. ¶¶ 181, 182.

28

Plaintiffs have alleged that defendants made false and defamatory statements to EFG in order to disgrace and damage plaintiffs' good standing and reputation in the financial, technology, and social media communities. Plaintiffs also allege that defendants made these statements maliciously with the intent to harm plaintiffs' personal and professional reputation and that EFG terminated the finder arrangement it had with plaintiffs as a result of these statements. This allegedly caused plaintiffs $30 million in damages.

Because the court allowed plaintiffs to proceed with their defamation claim predicated on many of these same allegations, it also finds that this independent tort satisfies the first prong of the "wrongful means" analysis and denies defendants' motions with respect to plaintiffs' tortious interference claim.

CIVIL CONSPIRACY

Finally, defendants move to dismiss Count Nine, which alleges civil conspiracy. As defendants note, it is true that New York does not recognize civil conspiracy as an independent tort. See Burdick v. Verizon Communications, 305 AD2d 1030, 1031 (4th Dep't. 2003). Nonetheless, a plaintiff may plead the existence of a civil conspiracy as a parasitic claim in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme. Briarpatch Ltd., L.P. v. Pate, 81 F.Supp.2d 509, 516 (S.D.N.Y. 2000).

To state a claim of civil conspiracy, a plaintiff must allege the primary tort and four additional elements: (a) a corrupt agreement between two or more persons, (b) an overt act

in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury. Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

Here, the court finds that plaintiffs have alleged colorable underlying torts of breach of fiduciary duty, tortious interference, and defamation. Plaintiffs further allege each of the elements of civil conspiracy: a corrupt agreement to deny plaintiffs their finder's fees and interfere with their business relations; overt participation in potential deals and communications concealed from plaintiffs intentional participation to further the purpose of their agreement; and, damages. Am. Compl. ¶ 193, ¶ 194-95, ¶¶ 196-97, ¶ 198. The court finds that amended complaint therefore appears to attempt to establish concerted action in connection the underlying torts alleged. Therefore, the court denies defendants' motions with respect to Count Nine.

## CONCLUSION

For the forgoing reasons, the court denies defendants' respective motions to dismiss in their entirety.

This opinion will resolve docket item numbers 7 and 13.

SO ORDERED.

Dated: New York, New York
      March 22, 2013

_Thomas P. Griesa_
Thomas P. Griesa, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-22-13

30