```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 19 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ANTARES MANAGEMENT LLC, et al.,        :
                                        :
                  Plaintiffs,           :
                                        :                12 Civ. 6075 (KBF)
                                        :
        -v-                             :
                                        :                MEMORANDUM
GALT GLOBAL CAPITAL, INC., et al.,      :                DECISION & ORDER
                                        :
                  Defendants.           :
---------------------------------------------------------- X
KATHERINE B. FORREST, District Judge:

On June 22, 2012, plaintiffs Antares Management LLC ("Antares") and

Saransh Sharma ("Sharma") (together, "plaintiffs") filed this action in New York

State Court, New York County, against defendants Galt Global Capital, Inc.

("Galt"), Global Innovation Fund, Ltd. ("GIF"), and Gary Bartholomew

("Bartholomew"), alleging breach of contract, breach of fiduciary duty, quantum

meruit, unjust enrichment, and estoppel. (Not. of Removal ¶ 1, Ex. 1, Aug. 9, 2012,

ECF No. 1.) On August 31, 2012, plaintiffs filed an amended Complaint that

contains additional allegations for breach of a non-circumvention agreement,

defamation,[1] tortious interference with prospective economic advantage, and civil

conspiracy; plaintiffs also named an additional defendant, Global Innovation SPV I,

Ltd. ("the SPV"). (See Am. Compl. ¶¶ 171-198, Aug. 31, 2012, ECF No. 12.)

This dispute involves a fairly convoluted and tumultuous business

relationship between plaintiff Sharma and defendant Bartholomew (and their

---

[1] Plaintiffs now concede that their defamation claim fails as a matter of law.
(Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary
Judgment ("Pls.' Mem.") at 14 n.10, Jan. 30, 2014, ECF No. 66.)

1

respective corporate entities).  Over the course of roughly two years, Sharma and Bartholomew worked to secure investments in pre-initial public offering shares of Facebook, Inc. ("Facebook").  Three potential investments – none of which were ultimately successful – are now at issue:  one by Alicia Livingston, one by Junthoor Corporation, and one by EFG Financial Products ("EFG").

Neither plaintiffs nor defendants have told a clear narrative in briefing the motion for summary judgment.  The record is difficult to follow and replete with acts of questionable business conduct, deceit, and distrust on both sides.  Nonetheless, a review of the undisputed and undisputable events – in the order they transpired – reveals the insufficiency of plaintiffs' claims.

For all of the reasons set forth below, defendants' motion for summary judgment is GRANTED.

I.     PROCEDURAL HISTORY

On June 22, 2012, plaintiffs Sharma and Antares filed this action in New York State Court, New York County, against defendants Galt, GIF, and Bartholomew, alleging breach of contract, breach of fiduciary duty, quantum meruit, unjust enrichment, and estoppel.  (Not. of Removal ¶ 1.)  On August 9, 2012, defendants removed the action pursuant to this Court's diversity jurisdiction, 28 U.S.C. § 1332(a).  (ECF No. 1.)  On August 31, 2012, plaintiffs filed an amended Complaint.  (ECF No. 12.)  The amended Complaint contains additional allegations for breach of a non-circumvention agreement, defamation, tortious interference with

prospective economic advantage, and civil conspiracy; it also names an additional defendant, the SPV. (See Am. Compl. ¶¶ 171-198.)

On April 1, 2013, defendants filed an Answer (ECF No. 31), and on August 16, 2012, defendants filed a motion to dismiss. (ECF No. 7.) That motion was denied on March 22, 2013. (ECF No. 29.) On June 6, 2013, this action was reassigned from The Honorable Thomas P. Griesa to the undersigned. (ECF No. 33.)

On January 13, 2014, defendants filed the motion for summary judgment now pending before this Court. (ECF No. 55.) That motion became fully briefed on February 11, 2014.

II.    FACTUAL BACKGROUND

Plaintiffs' Rule 56.1 Statement purports to reveal disputes of material fact; review of the record reveals otherwise. There are no facts material to the resolution of this motion truly in dispute or disputable. The following facts either are not or cannot be disputed, except where otherwise noted.

In 2007, Bartholomew and Trevor Michael created Galt, a global asset manager and financial advisor. (Defs.' R. 56.1 Stmt. ¶¶ 2-3; Declaration of Gary Bartholomew ("Bartholomew Decl.") ¶¶ 4-5, Jan. 13, 2014, ECF No. 56.)

In April 2008, GIF, an open-ended mutual fund, was incorporated (Bartholomew Decl. ¶¶ 11-12), with Galt as its investment manager. (Defs.' R. 56.1 Stmt. ¶¶ 8, 10; Bartholomew Decl. ¶ 13.) The investment objective for GIF was to invest in technology companies. (Defs.' R. 56.1 Stmt. ¶ 9.) GIF eventually issued

3

Class C Participating Shares to invest in pre-initial public offering Facebook shares. (Id.; Bartholomew Decl. ¶ 12.)

In the fall of 2010, Bartholomew was introduced to plaintiff Sharma by Paul Regan, whose company, Park Ridge Partners LLC, was the exclusive U.S. marketing agent for Galt and GIF. (Defs.' R. 56.1 Stmt. ¶¶ 26-29; Pl.'s R. 56.1 Stmt. ¶ 29; Bartholomew Decl. ¶¶ 29 (explaining that "Regan was going to market the funds Galt was involved with in exchange for a commission or finder's fee for any consummated transactions he introduced"); Declaration of Ryan Cummings ("Cummings Decl."), Ex. 4 at 9, Jan. 13, 2014, ECF No. 58.)[2] According to Regan, Sharma was an outside contractor for Park Ridge Partners. (Cummings Decl., Ex. 4 at 53-54.)[3]

On October 15, 2010, Sharma emailed Bartholomew a list of contacts in Oman, where Sharma claimed to have connections to potential corporate and individual investors. (Defs.' R. 56.1 Stmt. ¶¶ 39, 44; Bartholomew Decl. ¶¶ 39-40; Cummings Decl., Ex. 8; Declaration of Saransh Sharma in Opposition to Defendants' Motion for Summary Judgment ("Sharma Decl.") ¶ 5, Jan. 29, 2014,

---

[2] Galt, GIF, the SPV, and Bartholomew never entered into a written agreement with Regan, nor any company with which he was affiliated, regarding a commission or finder's fee arrangement. (Bartholomew Decl. ¶ 33; see also Cummings Decl., Ex. 4 at 37 (Regan testifying at his deposition that he was at no time defendants' employee).) Bartholomew stopped communicating with Regan in December 2010. (Bartholomew Decl. ¶ 35.)

[3] Defendants provide an unsigned Term Sheet that states Park Ridge and Galt would compensate Sharma for investor introductions. (Cummings Decl., Ex. 56.) The Term Sheet provides that upon the introduction of at least $1,000,000 into a Galt transaction and/or GIF, Sharma will be deemed a Vice President of Park Ridge and will receive an annual salary of $200,000. (Id.)

4

ECF No. 63.) Junthoor Corporation was included on the list. (Id.) In his email, Sharma stated: "I would like to settle on a contract between us prior to these meetings so that there are no ambiguous situations about our arrangements." (Cummings Decl., Ex. 8.)

On October 25, 2010, Bartholomew wrote Sharma an email outlining a number of different opportunities for Sharma to consider. (Declaration of Justin M. Sher in Opposition to Defendants' Motion for Summary Judgment ("Sher Decl."), Ex. 10, Jan. 29, 2014, ECF No. 65.) Bartholomew stated: "All these funds are being marketed by Arabia-Asia Capital Alliance in Dubai (DIFC) and we have the exclusive for this region. We can engage you as an agent in this to deal to get 50% of the commissions paid by the manager upon closing of the capital." (Id.; see also Sharma Decl. ¶ 8 (explaining that during his first call with Bartholomew, they discussed an arrangement "whereby [Sharma] would introduce potential investors to Galt in exchange for 50[%] of any fees generated.").)

In late-October 2010, Sharma and Michael met with one of Sharma's Saudi contacts; nothing came of the meeting. (Defs.' R. 56.1 Stmt. ¶¶ 47-48; Bartholomew Decl. ¶¶ 43-44.)[4] In November 2010, Sharma met with a series of contacts in Oman. (Id. ¶ 56.) No one from or on behalf of Galt attended these meetings. (Id. ¶ 48.)

---

[4] According to Bartholomew, Michael relayed that he did not feel Sharma's contacts were of the quality Sharma was representing them to be; Michael advised Bartholomew that they not spend time on Sharma or his contacts. (Bartholomew Decl. ¶¶ 44-45.) Sharma alleges that nothing came of the meeting because defendants' funds were "too small" for the contact to recommend to his clients. (Sharma Decl. ¶ 15.)

In late-2010, Sharma raised with Bartholomew the possibility of an investment by an individual named Craig Berkman. (Defs.' R. 56.1 Stmt. ¶ 60; Bartholomew Decl. ¶ 49.) Sharma indicated that Berkman was looking to invest $42 million in Facebook stock prior to the initial public offering. (Defs.' R. 56.1 Stmt. ¶ 61; Bartholomew Decl. ¶ 50.) To illustrate Berkman's capacity for such an investment, Sharma presented Bartholomew a bank statement that showed a $42 million deposit from Berkman. (Defs.' R. 56.1 Stmt. ¶ 62; Bartholomew Decl. ¶ 52.)[5]

Subsequently, Sharma informed Bartholomew that Berkman was actually looking to invest $250 million. (Defs.' R. 56.1 Stmt. ¶ 64.) In response, Bartholomew informed Sharma that plaintiffs would be willing to issue Sharma a share of Galt. (Id.; Pls.' R. 56.1 Stmt. ¶ 64; Bartholomew Decl. ¶ 53.) Bartholomew claims that the share was contingent upon the closing of the deal (Bartholomew Decl. ¶ 53); plaintiffs dispute this fact. (Pls.' R. 56.1 Stmt. ¶ 64.)[6]

On January 29, 2011, Bartholomew sent Sharma an email that contained Sharma's new Galt email address and instructed Sharma to use "Managing Partner, Galt Capital LLC" as his signature. (Cummings Decl., Exs. 15, 17.)

---

[5] Bartholomew subsequently learned that Sharma wired the money back to Berkman within three days of the initial wire to Sharma. (Defs.' R. 56.1 Stmt. ¶ 63; Bartholomew Decl. ¶ 52.)

[6] According to Sharma, he had entered into a joint venture with defendants whereby he would split any fees generated equally. (Sharma Decl. ¶ 32.) Sharma contends: "While I understood that [d]efendants invited me to become a partner because they were impressed by my connections to Alicia Livingston [see infra], I never understood that our arrangement was contingent on the execution of that deal." (Id. ¶ 35.)

On January 31, 2011, Bartholomew wrote Sharma an email that attached a number of documents, including the articles of incorporation and share/director registry for Galt. (Cummings Decl., Ex. 9.) Bartholomew wrote: "For you, we will issue one share making you an equal partner in the deal. . . . We are very excited about having you as our partner upon the delivery of the $250M into GIF to buy Facebook stock under the terms being negotiated with Craig." (Id. (emphasis added).) Sharma responded: "Thank you Gary. I am excited to be on board[,] too." (Id.)

On February 6, 2011, Sharma received an email instructing him to draft a profile of himself for Galt's website. (Id., Ex. 16.) The email states that the profile would be posted after the deal closed. (Id.)

Throughout February 2011, Bartholomew and Sharma continued to work on the Berkman investment. (Defs.' R. 56.1 Stmt. ¶ 67; Bartholomew Decl. ¶ 55.) Berkman and Sharma introduced Bartholomew to Patrick Carolan and Mark Weiner, who the parties continued to work with moving forward. (Sharma Decl. ¶ 24.)

Ultimately, Berkman did not invest with plaintiffs. (Defs.' R. 56.1 Stmt. ¶¶ 67-68; Pls.' R. 56.1 Stmt. ¶¶ 67-68; Bartholomew Decl. ¶ 56.) It became apparent that Berkman was not the investor, but rather was acting as an intermediary for an investor named Alicia Livingston, who was interested in purchasing pre-initial public offering Facebook stock. (Defs.' R. 56.1 Stmt. ¶ 70; Bartholomew Decl. ¶ 58.)

7

Negotiations with Livingston's representatives regarding a potential investment, either directly or through GIF, began. (Defs.' R. 56.1 Stmt. ¶ 71.)

On March 4, 2011, the various intermediaries to the proposed transaction – Galt, Sharma, and an entity called Equinox Global Partners, Inc. ("Equinox Global"), with which Carolan and Weiner were associated – entered into a Memorandum of Understanding ("MOU") that dictated how the fees generated from the Livingston transaction would be divided. (Sher Decl., Ex. 2; Sharma Decl. ¶ 25.) The MOU provided that shares of Galt would be divided as follows: 1 Ordinary Share for Pilkington Capital Corporation (owned by Bartholomew), 1 Ordinary Share for Reardon Capital Corporation (owned by Michael), 1 Ordinary Share for Sharma, and 3 Ordinary Shares for Equinox Global. (Sher Decl., Ex. 2.) The MOU further provided that Pilkington, Reardon, and Sharma would all be referred to as "Founders" of Galt. (Id.)

On March 25, 2011, Sharma, Galt, and Equinox Global created a Delaware limited liability company, Equinox Galt Capital Partners, LLC ("Equinox Galt Capital") to more formally deal with the division of fees from the Livingston investment. Sharma's counsel prepared a number of the necessary documents. (Defs.' R. 56.1 Stmt. ¶ 76.)

The Term Sheet and Release Agreement for Equinox Galt Capital ("the Term Sheet") explicitly states that its purpose is to "structure the parties' participation in the Transaction" – which is defined as "a transaction or transactions involving the acquisition of Class A or Class B common shares, Founder's shares, or other shares

8

("Shares") of Facebook, Inc. ("Facebook") to be sourced . . . and acquired using funds
provided by investors organized and led by Alicia Livingston . . . ." (Cummings
Decl., Ex. 10 ¶ 1.) The Term Sheet provides that Sharma, Galt, and Equinox Global
each own 33.3% of the newly-formed Equinox Galt Capital. (Cummings Decl., Ex.
10 ¶ 2.) The agreement expressly supersedes the MOU, as well as a March 24, 2011
Term Sheet and Release Agreement. (Id. ¶ 5.) The Term Sheet provides:

> Galt and Equinox acknowledge that, in connection with
> the Proposed Transaction, Galt and Equinox previously
> entered into a Memorandum of Understanding, dated
> March 4, 2011 . . . pursuant to which, inter alia, Galt
> agreed that if a Transaction occurred involving
> purchasers that were introduced by Equinox, then
> Equinox would be allowed to participate in any fees or
> other revenue received by Galt in connection with such
> Transaction on the terms specified in the Prior
> Equinox/Galt MOU.
>
> Galt and Equinox each hereby acknowledge and agree
> that the Prior Equinox/Galt MOU is hereby terminated,
> superseded in its entirety by this Agreement, and shall no
> longer have any effect from the date hereof.

The agreement also contains an express release provision between Galt and

Sharma. (Id. ¶ 8.)

> Release of Galt by Mr. Sharma. Mr. Sharma (and any
> entity controlled by or affiliated with Mr. Sharma) and his
> affiliates agree to release Galt, together with all of its
> successors, subsidiaries, parents, predecessors, affiliates,
> divisions, owners and assigns and each of their agents,
> employees, representatives, officers and directors (the
> "Galt Released Parties") from any and all suits, causes of
> action, actions, judgments, liens, damages, losses, claims,
> cross claims, counterclaims, third party claims, appeals,
> expenses, fees, costs, liabilities and demands whatsoever,
> whether know[n] or unknown, hidden or concealed,
> derivative or direct, contingent or non-contingent, in law

9

> equity or otherwise which they ever had, now have, or
> hereafter can, shall or may have, for, upon or by reason of
> any action, transaction, practice, conduct, inaction,
> matter, cause, effect or thing of any kind whatsoever,
> which arises prior to the date hereof out of, or releases to
> actions or inactions taken prior to the date hereof with
> respect to Galt or any proposed transaction involving the
> acquisition of Shares.

(Id. ¶ 8.)

In early April 2011, Bartholomew had an email communication with various

associates, including Weiner and Carolan, regarding concerns about Sharma.

(Cummings Decl., Exs. 6, 19.) Bartholomew, Weiner, and Carolan each expressed

distrust of Sharma and desire to cut him out of the Livingston deal. (Id.)

In April 2011, Sharma made a $10,000 loan to 2120315 Ontario, Inc., a

company owned by Pilkington (i.e., Bartholomew). (Id., Ex. 4 at 116-17.) The

money was used to pay the company's phone bills and operating expenses. (Id. at

117.) Prior to that, Sharma made a $12,300 loan to xRM Global, Inc., of which

Bartholomew was the founder, chairman, and CEO. (Id. at 116-18.) The evidence

incontrovertibly illustrates that defendants repaid Sharma for both loans. (Pls.' R.

56.1 Stmt. ¶ 97 (undisputed fact that the 2120315 Ontario, Inc. loan was repaid);

Cummings Decl., Ex. 3 at 147 (Sharma testifying at his deposition that the loan to

xRM Global was repaid).)[7]

On April 23, 2011, Bartholomew emailed Sharma requesting his help

identifying investors. (Cummings Decl., Ex. 12.) He wrote: "Let['s] get this deal

---

[7] Plaintiffs allege Sharma was not repaid for the $12,300 loan to xRM Global, Inc.
(Pls.' R. 56.1 Stmt. ¶ 94.) In support of their position, plaintiffs cite to Exhibit 46 of
the Sher Declaration, but no such exhibit exists.

10

with Alicia done. Also if you have any capital source that we can push to the fund fee split of 50% to the capital and the pitch is we have access to FB stock at $23-25/share . . . . Do you think we can pull a $150M from JP Morgan?" (Id.) In response, Sharma wrote: "I do have JP [M]organ's contact info and I know they are looking for stock. The only concern is we are screwing around with Berkman. . . . Will keep you posted." (Id.)

On July 2, 2011, Bartholomew wrote an email (it is not clear to whom) stating: "I understand the anger we all feel towards him [Sharma] but at this stage he did deliver the highest quality access to [Livingston] and if we get away with paying him 1.25 percent gross [it] is still a great deal. . . . Hope he doesn't decide to get involved and mess this up." (Cummings Decl., Ex. 19.)

Also in July 2011, Sharma informed Bartholomew that he had a (stolen) client contact list from his former employer, AllianceBernstein, he was willing to share.[8] (Defs.' R. 56.1 Stmt. ¶ 126.) Sharma provided a sample list to defendants; he claimed all of the names on the list were institutional investors (though this ultimately ended up not being true). (Id. ¶¶ 128-29; Cummings Decl., Ex. 13.)[9] Plaintiffs allege that defendants agreed to pay $10,000 for the client list. (Defs.' R. 56.1 Stmt. ¶¶ 127-135; Pls.' R. 56.1 Stmt. ¶¶ 126, 131-34; Cummings Decl., Ex. 24.)

---

[8] Sharma worked for AllianceBernstein L.P. from May 2005 to mid-2009. (Defs.' R. 56.1 Stmt. ¶ 125.)

[9] It is disputed whether Sharma knew the list was not in fact comprised of institutional investors, but resolution of that dispute is unnecessary to resolution of this motion. (Defs.' R. 56.1 Stmt. ¶ 130; Pls.' R. 56.1 Stmt. ¶ 130.)

In September 2011, Sharma notified Bartholomew that he had a contact who was a potential source of Facebook shares in California; the contact was a lawyer who represented Facebook employees and former employees with Facebook shares to sell. (Defs.' R. 56.1 Stmt. ¶ 112; Bartholomew Decl. ¶ 97.)

Around this time, Sharma and Bartholomew engaged in a lengthy chat via Blackberry messenger or text.[10] (Cummings Decl., Ex. 41.) Bartholomew stated: "[Sharma,] the buyer is hounding me. We just got another order for 15m shares, same deal. We need to get the lawyer dude working all weekend, let's get on it." (Id.) Sharma responded that he had reached out to his contact (i.e., "the lawyer") and was waiting to hear back. (Id.)

Later, Sharma said: "Trust me I am extremely eager to get a deal done. If anything, I have acted as a partner with you from the beginning. I have no problem doing the deal for the call lists [i.e., the AllianceBernstein client database] either for 10K. That would definitely help a lot. However, I was hoping for a little more of a preferential treatment. . . . Thus, if you succeed with these call list clients or the [F]acebook transactions I hope you will try to help me out with a bonus or something. . . ." (Id.)

Bartholomew subsequently wrote: "On the client database[,] I will pay you a 10% bonus on the fee we collect from the investors on their capital. If that's good I will draw up the term sheet and let's get going." (Id.) Sharma agreed. (Id.)

---

[10] The chat appears to have occurred over the course of a number of days.

Later in the conversation, Bartholomew indicated that he had a deal closing. (Id.) Sharma responded: "Are you serious? That is great news. Do you know when you will receive the funds[?] Also just to clear it up you will have [xRM] pay me 10K, then you will have Galt pay me 10K for the loan and 10K for the call lists[,] correct[?] I understand that all cannot come from this closing but I am really hoping that either 10 or 20 can clear up. As you know[,] I am quite desp[er]ate." (Id.) Bartholomew responded, "Yes[,] that [is] the plan." (Id.)

On September 23, 2011, Bartholomew sent Sharma Galt's standard Non-Disclosure and Non-Circumvention Agreement ("NCND"). (Defs.' R. 56.1 Stmt. ¶ 114.) In his email, Bartholomew wrote: "[A]ttached is the NCND that you, the lawyer[,] and eventually all the sellers need to execute before we go any further. Once we have the NCND signed I will send over the term sheet for the seller to complete and execute along with the formal fee agreement." (Cummings Decl., Ex. 14.) On September 24, 2011, Bartholomew (on behalf of Galt) and Sharma (on behalf of Antares, which Sharma had formed in March 2011) signed the NCND. (Id., Ex. 15; Sharma Decl. ¶ 74.)

Thereafter, Sharma revealed Peter Healy, a partner at O'Melveny & Myers LLP, as his connection to owners of Facebook stock. (Defs.' R. 56.1 Stmt. ¶ 117; Bartholomew Decl. ¶ 102.)

In response, Bartholomew told Sharma that defendants already knew Healy through Carolan and Weiner. (Defs.' R. 56.1 Stmt. ¶ 118; Bartholomew Decl. ¶¶ 91, 103.) According to defendants, Galt had been working with Carolan and Weiner

13

since the summer to find Facebook shares, and Weiner had a relative who worked with Healy and had made the introduction. (Bartholomew Decl. ¶¶ 91-92, 94-95.) However, Healy testified at his deposition that Sharma had introduced him to Bartholomew. (Cummings Decl., Ex. 5 at 20.)[11] Resolution of this dispute is unnecessary to the resolution of this motion

On November 4, 2011, Sharma and Bartholomew communicated about Sharma's ability to obtain Facebook shares at a particular price. (Cummings Decl., Ex. 16.) Bartholomew wrote: "Can you get 1.5m shares at 31 [b]ut have the price set at 32 and we split the fee?" (Id.) Sharma responded, "I can try...." (Id.) On November 22, 2011, Sharma provided Bartholomew and Healy with each other's contact information. (Sher Decl., Ex. 23.)

Sometime in late-November 2011, Bartholomew and Sharma learned that Livingston had closed her purchase of the Facebook stock directly, leaving both Sharma and defendants out of the transaction. (Defs.' R. 56.1 Stmt. ¶¶ 72, 88; Bartholomew Decl. ¶ 74.)[12]

On December 13, 2011, Sharma initiated an email exchange with Bartholomew. (Cummings Decl., Ex. 42.) Sharma wrote, inter alia, "Healy was asking if he should consider [the] deal with you dead. Didn't want to spent time

---

[11] On September 28, 2011, Sharma had an email conversation with Healy during which he inquired whether Healy was familiar with either Bartholomew or Galt Capital Global; Healy said he was not familiar with either one. (Sher Decl., Ex. 22.)
[12] Livingston has never, directly or indirectly, consummated a transaction with Galt, GIF, the SPV, or Bartholomew. (Defs.' R. 56.1 Stmt. ¶ 89; Bartholomew Decl. ¶ 75.) Equinox Galt Capital has never completed any transaction. (Bartholomew Decl. ¶ 76.)

14

identifying blocks for you if you weren't serious. I said u were serious and were ever closer to transacting . . . ." (Id.) In response, Bartholomew wrote: "I will get you $5k today when more dough arrives. The $10k for Galt let's shoot for next week . . . . As for Healy . . . you know Patrick has also been in touch with him regarding shares, and Mark['s] cousin works at the firm." (Id.) In response, Sharma wrote: "Yes I am also familiar with Mark and Patrick knowing Healy. Are they partners with you in these transactions? Have they helped raise monies for Galt? Finally, have they invested in Galt when Galt needed it most? Each one of us has the same access. [T]he choice is your as to how you want to proceed." (Id.)[13]

On December 19, 2011, Sharma sent Bartholomew another email: "I have received a mandate to acquire 3.5 [million] shares in a single trade. Please call me so we can discuss." (Cummings Decl., Ex. 17.) While not referring to the deal by name at the time, it is now evident Sharma was referring to a potential investment by Junthoor Corporation.

In response to Sharma's email, Bartholomew wrote: "I a[m] buried in multiple closings right now so it's a bit overwhelming to stay on top of everything at the moment. You have a buyer, why aren't you lining up the trade with Healy? What do you need us for?" (Id.) Sharma wrote back:

> I was trying to bring something to the team given we have all worked towards the same goal all year. Plus you were willing to run a trade by me in order to recognize the work we did together.

---

[13] On December 21, 2011, Healy sent Bartholomew a series of draft documents regarding a prospective deal. (Sher Decl., Ex. 24.)

15

> Anyways, you seem to believe you can get 3 [m]illion
> shares for under 31. Therefore, I thought you might have
> shares. If you do, then there is a deal here. If not then
> that's fine too. I can manage buyer expectation to pay a
> slightly higher price.
>
> Finally, please let me know when you will wire the 10K
> this week.
>
> Saransh

(Id.) Less than two hours later, Sharma wrote a follow up email:

> Gary,
> I have tried to be partners with Galt for the past year and
> a half. At every step of the way I have always invested
> more in this relationship than you have. At this juncture,
> you have made it very clear to me that you have no intent
> of doing any business with me going forward.
>
> Therefore, please see that you reimburse me for the 10K
> you owe me from months ago. In the event you are
> unable to pay this week then I will have to consider and
> possibly pursue legal action. . . .

(Id.) Sharma did not provide any additional information about the nature of the

potential Junthoor Corporation investment.

On January 3, 2012, Sharma emailed Bartholomew again. (Sher Decl., Ex.

14.) The email stated:

> Hey Gary,
> Hope all is well with you. Sorry to keep bothering you but
> I am a bit concerned since I haven't heard anything from
> you in over a week. Please let me know where things
> stand with the 10k as I am on the hook with expenses.
>
> Additionally, you had requested that I find you 3 [m]illion
> shares from as few sellers as possible. I currently have a
> 3.5 [m]illion share block at 30.75 from 1 seller. Please let
> me know how you would like me to proceed. We can buy

16

> this in smaller portions if you'd like. Time is of the
> essence here.

(Sher Decl., Ex. 14.) In response, Bartholomew stated that he was out of town with

his family, that the pay request was received, and that he was waiting on a closing

to occur that week. (Id.) Sharma then asked whether Bartholomew was interested

in speaking to the seller of the shares; Bartholomew declined, saying he had all of

the shares he needed at that time. (Id.)[14]

On January 5, 2012, Bartholomew wrote Healy an email that stated:

"Peter[,] we have a major institution we are working with that wants us to purchase

10M shares at $30.50, if you think there is supply there at this price we can move

quickly to execute . . . ." (Sher Decl., Ex. 21.) Healy wrote in response: "Gary. Can

we discuss? Would you only be an agent? Thanks." (Id.)

On January 6, 2012, Sharma sent Bartholomew an email with the subject

line, "Update." (Cummings Decl., Ex. 19.) Sharma wrote: "Please provide me with

an update of where things stand. I am getting a lot of pressure from everyone. Can

I depend on the 10K clearing on Monday or Tuesday[?] I really need it to." (Id.)

On January 8, 2012, Sharma emailed Bartholomew with an email that

stated: "I need you to wire asap." (Cummings Decl., Ex. 20.) Three hours later, he

sent another email to Bartholomew: "I hate to bother u this much but could u

please provide me with an update." (Id., Ex. 21.)

---

[14] Bartholomew explained his disinterest as follows: "We're not brokering shares.
We're an asset manager buying shares for our fund. What he's asking us to do is to
be a broker. That's not what we[] do – not what we're doing." (Sher Decl., Ex. 4 at
183-85.)

The following day, on January 9, 2012, Sharma emailed Bartholomew: "Can u please let me know where things stand[?]" (Id., Ex. 22.) Sharma also wrote an email to Bartholomew with the subject line, "Update!" (Id., Ex. 23.) Sharma stated: "It[']s been over a week and I haven't heard anything from you. I will need the 10K this week so please keep me in the loop of where things stand. Creditors are blowing my phone up asking when and I don't have an answer for them. . . . Your silence is troubling. I have tried calling, emailing[,] and [B]lackberry messaging and I am at a stage where I will have to consider legal action against [G]alt." (Id.)

Bartholomew responded later that day. (Id., Ex. 24.) He wrote: "No update, and starting legal action on a stolen database from a previous employer, that ought to be interesting. We will pay you when we can." (Id.) Sharma responded by defending his potential legal position regarding the client database. (Id.)

On January 10, 2012, Sharma wrote Bartholomew an email that said: "For the final 10K, I would like you to wire those funds to a different bank account compared to [the] one you have previously wired to[]. Let me know when you will be closer to wiring the funds over so I may provide you with the necessary details." (Id., Ex. 25.)

Also on January 10, 2012, Sharma allegedly received an expressly non-binding letter of intent from Junthoor Corporation. (Cummings Decl., Ex. 2 at 40.) In the letter, Junthoor Corporation expresses an interest in pursuing an investment in Facebook. (Sher Decl., Ex. 1.) The letter of intent specifies that GIF, managed by Galt, would conduct the transaction; 10,000,000 Class B Common Shares of

Facebook, Inc. would be purchased at a price of $31.00 per share or better. (Id.)
The fee structure would be 10% upfront and 20% performance. (Id.) The total
investment amount would be $341,000,000, constituting $310,000,000 in principal
and $31,000,000 in front end fees. (Id.) Sharma did not share this letter of intent
with defendants. (Defs.' R. 56.1 Stmt. ¶ 152.)[15]

On January 11, 2012, Bartholomew wrote Sharma the following Blackberry
messages:

- "Firstly, your database which we tested was mainly brokers and advisors
  and led to nothing. So we are not using it." (Cummings Decl., Ex. 27.)

- "Second, you do not represent Galt, so calling Healy to tell him Galt has
  no interest in doing business with him, you are no[t] authorized to do so."
  (Id., Ex. 28.)

- "Third, we have sourced our own shares and running our deal, we have no
  basis to work on anything together." (Id., Ex. 29.)

- "Fo[u]rth, I can send you you[r] database back, otherwise sit and wait
  until I can pay you." (Id., Ex. 30.)

- "Fifth, I don't see us doing business going forward, the Alicia trade was it
  and that thing is a zero. So if you have formal correspondence to Galt, put

---

[15] Plaintiffs dispute defendants' contention that prior to the filing of the lawsuit,
defendants had never seen the letter of intent. However, in support of this claim,
they cite the Sher Declaration: "On June 20, 2012 I wrote a letter to Gary
Bartholomew attaching a copy of a draft complaint that included as Exhibit 1 the
Letter of Intent from Junthoor Corporation dated January 10, 2012." (Sher Decl. ¶
2.)

it in a letter pdf, sign it and I will forward it to our accounting department

regarding you[r] payable." (Id., Exs. 31-32.)

On January 13, 2012, Sharma sent Bartholomew the following Blackberry

message:

> I have no issues with you deleting me as a contact on
> [B]lackberry. All I ask for is an update on when u would
> be able to wire. When u had no funds in [G]alt or u
> needed something from me like money or shares, I
> remember u throwing promises like "we will run a trade
> by you for all the work we did together" or "we will pay u
> a bonus if we close anyone from your database." Now I
> feel like you have an attitude that I owe u something.
> When all I have asked for is that u deliver what u
> promised back in [A]ugust. Anyways, just keep me posted
> on when u [will] be able to wire. The sooner the better so
> we may stop communication between us[,] as that is what
> u clearly desire. It[']s also obvious that u won't be
> purchasing any shares from Healy. Therefore I will
> inform him of why u cannot buy shares. And finally, I did
> have some small ticket items that you were looking for a
> home in addition to 1 large ticket item that I had been
> working on for quite some [] time now. I will let them
> know the circumstances and try and salvage something
> for myself.

(Id., Ex. 26.)

On January 18, 2012, Sharma emailed Bartholomew the following:

> Gary,
> You have left me entirely perplexed and frustrated since
> our last conversation. I don't understand how you can
> just end a year and a half's worth of a business
> relationship in a single text. I am deeply troubled by your
> actions since now I am faced with a very unusual
> dilemma.
>
> I have spent several months working on a 10MM share
> deal out of the Middle East. After several months, I have
> finally received a mandate to proceed with acquiring

20

> shares at 31. The unfortunate thing is that they
> conducted their due diligence on the Galt structure since
> they needed a sophisticated structure that could not be
> created over night.
>
> Given our last correspondence I am very unsure about
> how to proceed as this juncture. Due to a lack of a
> contractual agreement with you currently, I feel very
> vulnerable in conducting business with you. I believe that
> if you want to participate in this transaction then we
> would need to document an agreement immediately.
>
> . . . .

(Cummings Decl., Ex. 33.)

In response to Sharma's email, Bartholomew wrote: "There is nothing to proceed with. The Facebook trade is basically over. Alicia never did a trade, it's over. . . ." (Id.; see also id., Ex. 43.)

On January 22, 2012, Sharma wrote Bartholomew an email that provided updated bank account information for the $10,000 wire. (Id., Ex. 34.)

On January 24, 2012, Sharma allegedly received a termination letter from Junthoor Corporation, withdrawing its intention to invest in Facebook, Inc. (Sher Decl., Ex. 13.) The termination letter states: "Let it be made clear that this termination is due to your inability to arrange even a telephone conversation with the Managers of Galt or [GIF], especially after a Letter of Intent was sent to you." (Id.; see also Cummings Decl., Ex. 2 at 51 (a Junthoor Corporation executive testifying at his deposition, "I remember Saransh used to call me on a daily basis. It really got very irritating from him. And he said promising, promising, promising. Tomorrow, tomorrow, tomorrow. Nothing happened. We just pulled the plug out.").

21

Sharma conceded at his deposition that he never provided Junthoor Corporation with Bartholomew's contact information. (Cummings Decl., Ex. 3 at 188.)[16] Sharma similarly conceded that he never told defendants about the existence of the termination letter. (Id. at 207.)

On January 30, 2012, Sharma sent a Blackberry message to Bartholomew inquiring when Bartholomew would be able to wire the $10,000. (Id., Ex. 36.)

In February 2012, Sharma began communicating (using his Galt email address) with an individual at EFG, Nilesh Jethwa, about putting together a deal for pre-initial public offering Facebook stock. (Cummings Decl., Ex. 37; see also Sher Decl., Ex. 28.) On February 17, 2012, Sharma wrote Jethwa an email, thanking Jethwa for the USD $1.50 per share offer; Sharma stated "[i]t is acceptable to us." (Sher Decl., Ex. 28.) At that time, Sharma revealed to Jethwa the identity of the attorney on the seller's side, Peter Healy. (Id.) Sharma stated: "I met with Peter for a 90 minute meeting on Monday, where he confirmed current availability to the tune of 10 [m]illion shares and price levels between 33 and 35 (real[]istically closer to 34 and 35), I have personally retained the firm to represent me in other business matters[,] and I have successfully closed other transactions in Facebook with Peter." (Id.) Sharma and Jethwa then exchanged a handful of emails about the terms of a potential deal.

---

[16] A former Junthoor executive, Hussein Al-Lawati, testified at his deposition that the deal fell through because Sharma did not have the necessary information and failed to produce his contacts at Galt to speak with Al-Lawati. (Cummings Decl., Ex. 2 at 140-54.)

Also on February 17, 2012, Sharma emailed Healy requesting that Healy speak with his contacts at EFG. (Cummings Decl., Ex. 44.) On February 18, 2012, Sharma sent Healy a follow-up email inquiring whether Healy received his February 17, 2012 email. (Id.) On February 19, 2012, Sharma followed up again. (Id., Ex. 45.) Sharma stated: "I am losing credibility with the buyer with each passing day as they are beginning to question if I even have a relationship with you." (Id.) Also on February 19, 2012, Sharma emailed Healy explaining that EFG wanted more information about the process of the transaction. (Sher Decl., Ex. 27.)

On February 20, 2012, Sharma again wrote Healy, suggesting a time for a call with EFG. (Id., Ex. 46.) Sharma reiterated his concern about Healy's lack of responsiveness: "The lack of communication from you is really hurting my relationship and is leading the client to question my credibility." (Id.) Less than two hours later, Sharma wrote two more emails to Healy. (Id., Ex. 47.) The first states that EFG was offered stock from another source and that Sharma is "losing this opportunity due to a lack of communication." (Id.) The second states that Sharma has "managed to pacify the buyer for the time being" and that he is "not too concerned if we [are] able to orchestrate a call between you and them." (Id.)

On February 21, 2012, Healy responded requesting more information about EFG. (Id.) Sharma responded that day with more information about EFG and its proposed purchase. (Id.)

On February 25, 2012, EFG sent offer letters to both Juan P. Cappello of Greenberg Traurig, a lawyer who represents Galt, and to Sharma, who at that point

was associated with an entity called Aurus Advisors.[17] (Sher Decl., Ex. 8.) The
offer letter to Sharma states that it is an offer to purchase up to 15 million shares of
Facebook at the price of USD 34.5 per share, for a total consideration of
$517,500,000. (Id.) The offer letter to Galt states that EFG offers to purchase up to
2 million shares of Facebook at the price of USD 34.5 net per share, for a total
consideration of $69 million.[18] (Id.)

According to Bartholomew, Galt became aware of EFG's interest in pursuing
Facebook stock in February 2012 through Patrick Carolan, who had a colleague at a
firm in London who had a contact at EFG. (Bartholomew Decl. ¶¶ 140-41.)
Defendants allege that neither Bartholomew nor Michael discussed Sharma with
EFG; nor are they aware of anyone who communicated with EFG on behalf of Galt,
GIF, or the SPV about Sharma. (Defs.' R. 56.1 Stmt. ¶ 171; Bartholomew Decl. ¶
144; Sher Decl., Ex. 4 at 201.)

On February 27, 2012, Sharma emailed Jethwa stating that he had "a lot of
updates" to provide and scheduling a conference call. (Cummings Decl., Ex. 37.)

On February 28, 2012, Galt entered into a Consulting Agreement with EFG.
(Bartholomew Decl., Ex. B.) On March 3, 2012, Galt and EFG entered into an
Investment Consulting Agreement. (Id., Ex. C.)

---

[17] Sharma testified at his deposition that he started an entity called Aurum Capital
in January 2011. (Cummings Decl., Ex. 3 at 48.)
[18] There appears to be a typographical error in this document. The document states
that the number of shares is "2,000,000" but then says "one million." (Sher Decl.,
Ex. 8.)

24

On March 6, 2012, Sharma emailed Bartholomew: "You are hereby being informed to cease and desist in your attempts to contact or represent my client EFG Financial Products AG, that I introduced to your law firm Greenberg Traurig and your attorney Juan Cappello." (Cummings Decl., Ex. 38.) Sharma conceded at his deposition that this was the first notice given to defendants that Sharma believed EFG was his client contact. (Cummings Decl., Ex. 3 at 209.)[19]

Also on March 6, 2012, Sharma wrote Healy asking when he would like to call EFG "as discussed last evening." (Id., Ex. 49.)

On March 7, 2012, Healy emailed Bartholomew: "Gary. I am hearing you are trying to buy 10-20m shares. Is that true?" (Sher Decl., Ex. 29.) Bartholomew responded, "Yes[,] we have a large institutional client of Galt that wants 20M shares. . . ." (Id.)

On March 21, 2012, Sharma emailed Healy stating: "Please call asap as I have EFG and other groups re-engaged to speak with you. We are running out of time on all fronts here and I would really appreciate an hour of your time today whereby I can present everyone. . . . " (Id., Ex. 50.)

On April 5, 2012, Bartholomew emailed Healy: "Peter[,] do you have any small sellers[?] I have about $3m in cash between both funds rights now." (Sher Decl., Ex. 25.) In response, Healy wrote that he did not. (Id.)

---

[19] Sharma was unable to explain at his deposition what he had to offer EFG. (Cummings Decl., Ex. 3 at 222 (conceding that EFG is a sophisticated banking entity with U.S. employees).)

Ultimately, neither plaintiffs nor defendants closed any transaction with

EFG. (Defs.' R. 56.1 Stmt. ¶¶ 178, 182.) Similarly, neither plaintiffs nor

defendants ever closed any transaction with Healy. (Pls.' R. 56.1 Stmt. ¶ 122.)

## III. STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on

admissible evidence in the record placed before the Court, "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating

"the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). On summary judgment, the Court must "construe all evidence in

the light most favorable to the nonmoving party, drawing all inferences and

resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740

(2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's

claims cannot be sustained, the opposing party must set out specific facts showing a

genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F.

Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d

Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," because "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of

material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159,

166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In

26

seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts – i.e., "facts that might affect the outcome of the suit under the governing law" – will properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

IV.   ANALYSIS

a.   <u>Breach of Contract for Finder's Fee Agreement</u>

In order to make out a colorable breach of contract claim, plaintiffs must show:  (1) an agreement; (2) adequate performance by plaintiffs; (3) breach by the defendants; and (4) damages. <u>Fischer & Mandell LLP v. Citibank, N.A.</u>, 632 F.3d 793, 799 (2d Cir. 2011). Here, plaintiffs contend that plaintiffs and defendants had a finder's fee arrangement whereby defendants would compensate plaintiffs for any ready, willing, and able investor produced by plaintiffs. Plaintiffs' allegations fail for a number of reasons.

First, any finder's fee agreement reached between the parties in 2011 was contingent on a successful investment. There is no triable issue of fact as to that arrangement. For instance, on January 31, 2011, Bartholomew offered Sharma a

27

share of Galt "upon the delivery of the $250M into GIF to buy Facebook stock . . . ."
(Cummings Decl., Ex. 9.) On February 6, 2011, Bartholomew wrote an email to
Sharma that stated his profile would be posted on Galt's website upon the closing of
the deal. (Id., Ex. 16.) The Term Sheet and Release Agreement entered into in
March 2011 depended upon the closing of the Livingston transaction – it did not
contemplate the issuance of a share of Galt to Sharma unless the transaction
happened. (Id., Ex. 10 ¶ 1.)[20] Because the Livingston investment ultimately failed,
the finder's fee arrangement never became a binding contract.

Toward the end of 2011 and beginning of 2012, the record is indisputably
clear that no contractual relationship existed between the parties – contingent or
otherwise. Sharma himself acknowledged such fact: "Due to a lack of a contractual
agreement with you currently, I feel very vulnerable in conducting business with
you. I believe that if you want to participate in this transaction then we need to
document an agreement immediately." (Id., Ex. 33.) Sharma also wrote: "At this
juncture, you have made it very clear to me that you have no intent of doing any
business with me going forward." (Id., Ex. 17.) Bartholomew too made such fact
clear – when approached by Sharma, he wrote, "You have a buyer, why aren't you
lining up the trade with Healy? What do you need us for?" (Cummings Decl., Ex.
17.) Based the factual record, neither Bartholomew nor Sharma believed that there
was a contractual finder's fee arrangement between the parties by 2012, and no
reasonable factfinder could determine otherwise.

---

[20] Importantly, the Term Sheet and Release Agreement superseded any prior
agreements entered into by the parties.

28

Even were the parties to have had a binding contract, plaintiffs have failed as a matter of law to show a breach of such agreement. There is no evidence in the record that a mere introduction – without the ultimate consummation of a transaction – would have been sufficient for plaintiffs to generate a finder's fee. And, the record indisputably illustrates that there was no ultimately successful transaction that resulted from plaintiffs' introductions.

While Sharma does allege that he introduced defendants to an entity called SecondMarket – which the SPV later allegedly ultimately used to purchase its Facebook shares, generating an $800,000 fee (Sharma Decl. ¶¶ 134, 136-38) – this allegation is unfounded. Sharma cites an email exchange with a SecondMarket executive that he forwarded to Bartholomew (Sher Decl., Ex. 15), but the email exchange is not evidence of an introduction. As defendants point out, plaintiffs have failed to identify a witness from SecondMarket who could substantiate what are newfound allegations, nor do they put forth any other evidence in support of their claim alleged in the Complaint or plaintiffs' Rule 26 disclosures. (See Memorandum in Further Support of Defendants['] Motion for Summary Judgment ("Defs.' Reply") at 13-14, Feb. 11, 2014, ECF No. 69.)[21]

As for Junthoor, which plaintiffs allege would have resulted in a $31 million fee had defendants not acted in bad faith, based on the record no finder of fact could

---

[21] These allegations are made for the first time in plaintiffs' opposition to defendants' motion for summary judgment; they are made in the context of the NDNC, but are logically addressed in connection with the finder's fee claim, as well.

29

determine that defendants ever even knew about the investment, let alone that they acted in bad faith to reject it in breach of a contractual finder's fee agreement.

At no point in 2011 or 2012 did plaintiffs provide defendants with the name of the potential investor or the specifics of the purported deal.

On December 19, 2011, Sharma sent Bartholomew an email stating that he had received a mandate to acquire 3.5 million shares in a single trade. (Cummings Decl., Ex. 17.) No additional details about the nature of the deal were provided. (Id.)

On January 3, 2012, Sharma emailed Bartholomew inquiring about the status of the $10,000 he was owed. (Sher Decl., Ex. 14.) He also mentioned a 3.5 million share block at $30.75, but again, provided no additional information. (Id.)

Over the course of the next week and a half, Sharma sent Bartholomew a number of emails – in not a single one did he mention the potential investment. (Cummings Decl., Exs. 19, 20, 21, 22, 23, 24, 25.) Sharma explained that he was in debt and desperately needed the $10,000 – but failed to disclose that he is sitting on deal worth $31 million in fees.

On January 18, 2012, Sharma emailed Bartholomew that he received a mandate to proceed with acquiring 10MM shares at $31.00 per share, but that the investment would not go forward without Galt's participation. (Id., Ex. 33.) Yet, here again, no additional information about the deal or the potential money to be made was mentioned. Sharma suggested he would proceed without Galt and "try to salvage something" for himself. (Id.)

No reasonable factfinder could determine based on this evidence that Bartholomew knew about the nature of the Junthoor Corporation deal and rejected it in bad faith.

Bartholomew's responses to Sharma's messages further illustrate that there is no question of fact that he did not have notice of the Junthoor Corporation deal. On January 11, 2012, Bartholomew sent Sharma a number of Blackberry messages, stating: "I don't see us doing business going forward, the Alicia trade was it and that thing is a zero." (Cummings Decl., Exs. 31-32.)[22]  Responding to a January 18, 2012 email from Sharma, Bartholomew wrote that the Livingston transaction was over and thus, "[t]here is nothing to proceed with." (Id., Ex. 33.)  At no time does Bartholomew mention any deal besides the failed Livingston investment – no reasonable factfinder could determine based on this evidence that Bartholomew rejected the Junthoor Corporation deal in bad faith.  There is no question that Bartholomew believed his relationship with plaintiffs ended with the failure of the Livingston investment; no reasonable factfinder could determine that he knew about the Junthoor Corporation deal.

      b.  Breach of Contract for NDNC Agreement and Tortious Interference with Business Relationship

As stated, plaintiffs must show the following for a breach of contract claim: (1) an agreement; (2) adequate performance by plaintiffs; (3) breach by the

---

[22] In response, Sharma again fails to provide any detail about the transaction, instead merely stating that he had one "large ticket item" that he was working on but that he would "let them know the circumstances" and "try and salvage something" for himself.  (Cummings Decl., Ex. 26.)

defendants; and (4) damages.  <u>Fischer & Mandell LLP</u>, 632 F.3d 793, 799 (2d Cir. 2011).  To make out a claim for tortious interference with a business relationship, plaintiffs must show that: "(1) they had a business relationship with a third party; (2) the defendants knew of that relationship and intentionally interfered with it; (3) the defendants acted solely out of malice, or used dishonest, unfair, or improper [wrongful] means; and (4) that defendants' interference injured the relationship." <u>Carvel Corp v. Noonan</u>, 350 F.3d 6, 17 (2d Cir. 2003).

Here, there is no evidence to support plaintiffs' allegation that defendants wrongfully contacted EFG after having been introduced to them by plaintiffs, nor is there any evidence that defendants spoke about plaintiffs in a way that resulted in EFG's termination of its relationship with plaintiffs.

Bartholomew alleges that Galt became aware of EFG's interest in pursuing Facebook stock in February 2012 through Patrick Carolan.  (Bartholomew Decl. ¶¶ 140-41.)  While the record illustrates that Sharma was in active discussions with EFG in February, plaintiffs put forth not a shred of evidence that Sharma introduced defendants to EFG.  Sharma himself conceded during his deposition that it was possible defendants were introduced to EFG through Carolan.  (Cummings Decl., Ex. 3 at 229.)  Similarly, plaintiffs put forth no evidence that defendants spoke negatively about Sharma to EFG.  Without at least some evidence in support of plaintiffs' claims, they are nothing but conclusory allegations and thus must fail at this stage in the litigation.

Regarding plaintiffs' contention that defendants interfered with their relationships with Peter Healy and SecondMarket – allegations raised for the first time in connection with the summary judgment motion – the record again does not support plaintiffs' allegations. Regarding Healy, plaintiffs have failed to show any damages in support of their breach of contract claim because it is undisputed that neither Healy nor anyone he represented ever invested with plaintiffs or any other entity with which Bartholomew was involved. (Pls.' R. 56.1 Stmt. ¶ 122.) There is similarly no evidence, besides Sharma's conclusory and unsupported allegations, that defendants spoke negatively about plaintiffs to Healy or otherwise attempted to interfere with the business relationship between plaintiffs and Healy. As for SecondMarket (and as mentioned above), there is no evidence in the record that plaintiffs introduced defendants to SecondMarket. As such, there is no claim for a breach of the NDNC. There similarly is no evidence – again aside from Sharma's conclusory allegations – that defendants ever spoke negatively about plaintiffs to SecondMarket.

c. Breach of Fiduciary Duty

To make out a breach of fiduciary duty, plaintiffs must establish: (1) the existence of a fiduciary relationship; (2) misconduct by defendants; and (3) damages directly caused by defendants' misconduct. Kurtzman v. Bergstol, 835 N.Y.S.2d 644, 646, 40 A.D.3d 588 (2d Dep't 2007).

Even assuming the existence of a fiduciary relationship – an issue which the parties spend a great deal of time discussing in their papers – plaintiffs have failed

33

to show any misconduct on the part of defendants. Put simply, there is no evidence in the record that defendants reaped financial benefit as a result of plaintiffs' efforts. Because the deals that Sharma attempted to orchestrate all fell through, defendants engaged in no misconduct by failing to share proceeds from those deals with plaintiffs.

     d.  Quantum Meruit, Unjust Enrichment, and Estoppel

"The elements of a cause of action sounding in quantum meruit are (1) performance of services in good faith, (2) acceptance of services by the person to whom they are rendered, (3) expectation of compensation therefor, and (4) reasonable value of the services rendered." Evans-Freke v. Showcase Contracting Corp., 926 N.Y.S.2d 140, 141, 85 A.D.3d 961 (2d Dep't 2011) (citation omitted); see Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (explaining that unjust enrichment and quantum meruit are not separate causes of action; unjust enrichment is an element of a quantum meruit claim). A claim for promissory estoppel has the following three elements: (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of the reliance. Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989).

     Plaintiffs' claims for quantum meruit, unjust enrichment, and estoppel all must fail. Plaintiffs' allegations themselves indicate that plaintiffs expected to receive a portion of the fees that defendants generated from the introductions made

by plaintiffs.  Because the record is clear that defendants never recovered any fees as a result of plaintiffs' introductions, plaintiffs had no reasonable expectation of compensation.  Accordingly, plaintiffs' claims fail under principles of equity.[23]

    e.  <u>Civil Conspiracy</u>

New York law does not recognize a stand-alone cause of action for civil conspiracy.  <u>See, e.g.</u>, <u>Nissan Motor Acceptance Corp. v. Scialpi</u>, 94 A.D.3d 1067, 1069, 944 N.Y.S.2d 160 (2d Dep't 2012) (explaining that "a cause of action sounding in civil conspiracy cannot stand alone, but stands or falls with the underlying torts") (citations omitted).  Since plaintiffs have asserted no colorable tort claim, their civil conspiracy claim so too must fail.

V.    CONCLUSION

For the reasons aforementioned, defendant's motion for summary judgment is hereby GRANTED.  The Clerk of Court is directed to terminate the open motion at ECF No. 55 and to terminate the action.

    SO ORDERED.

Dated:    New York, New York
           May __19__, 2014

                                   KATHERINE B. FORREST
                                 United States District Judge

---

[23] There is undisputable that Sharma's loans to xRM Global, Inc. and 2120315 Ontario, Inc. were repaid.  (<u>See</u> <u>supra</u> at 10.)  As for the other monies allegedly spent by Sharma in connection with the attempt to obtain investors for pre-initial public offering Facebook shares, there is no evidence defendants ever promised to refund plaintiffs' expenses in the event that such efforts ultimately were unsuccessful.